# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **DILLON GAGE INCORPORATED OF** | § | |
| **DALLAS** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:18-CV-1555-B** |
| | § | |
| **CERTAIN UNDERWRITERS AT** | § | |
| **LLOYD'S, SUBSCRIBING TO POLICY** | § | |
| **NO. EE1701590** | § | |
| **Defendant.** | § | |

---

## DEFENDANT'S BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**Gerard J. Kimmitt, II**
**Susan H. Swanson**
HOLMAN FENWICK WILLAN
5151 San Felipe, Suite 400
Houston, Texas 77056
Telephone: (713) 917-0888
Counsel of Record

**Michael C. Wright**
RUSSELL & WRIGHT, PLLC
15770 Dallas Parkway, Suite 1050
Dallas, Texas 75248
Telephone: (972) 267-8400
Local Counsel

## ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

I. SUMMARY OF THE ARGUMENT ........................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 2

   1.   Dillon Gage's Claims against Underwriters for the two Losses. .............. 2

   2.   Agreed Stipulations of Fact Between the Parties ...................................... 3

   3.   The Policy .................................................................................................. 6

   4.   Underwriters Agreed to Pay the Claims Pursuant to the *Financial Crime – Invalid Payments Extension* ............................................................................... 8

   5.   Procedural History ..................................................................................... 9

III. SUMMARY JUDGMENT STANDARD ........................................................ 10

IV. ARGUMENT AND AUTHORITIES ............................................................... 11

A.   Underwriters did not breach the contract because the plain language of the *Invalid Payments Exclusion Clause* excludes coverage for Dillon Gage's Losses; and to read the Policy Exclusion otherwise would fail to give effect to each Policy provision, and thus render the Exclusion meaningless..............................................................11

   1.   Texas law applies....................................................................................... 11

   2.   The burden of proof in the insurance policy context. ............................... 11

   3.   Dillon Gage's Losses are excluded by the plain language of the *Invalid Payments Exclusion Clause* because the Losses were consequent upon handing over Insured Interest (precious metal coins) to a third party after payment by a fraudulent check............................................................................................................ 12

         a.   The Policy must be governed by its plain language; and all parts of the contract must be read together to ascertain the agreement of the parties so none are rendered meaningless..............................................................12

         b.   Dillon Gage sustained the Losses consequent upon handing over the insured property to a third party against payment by check proven to be false, fraudulent, or otherwise invalid or uncollectible..............………14

               i.   There is no dispute that both checks paid to Dillon Gage for the insured property were false, fraudulent, invalid, and uncollectible…14

               ii.  Dillon Gage sustained the Losses consequent upon handing over insured property against payment by fraudulent check……………..16

         c.   All causation arguments made by Dillon Gage related to what may have occurred differently in the course of the fraud are purely speculative and have no basis in this coverage analysis……………………………………20

**4.**     **Dillon Gage's claims are covered only to the extent that the** *Financial Crime – Invalid Payments Extension Clause* **applies**.............................................................. 21

**B.**     **Plaintiff's Extra-Contractual Claims Fail as a Matter of Law**...........................**21**

**1.**     **Because Plaintiff's breach of contract claim fails, Plaintiff's cause of action for violation of Texas Insurance Code §541 also fails as a matter of law because Plaintiff has no right to policy benefits, and there is no injury independent of a right to policy benefits**.............**21**

**2.**     **Plaintiff's Cause of Action for Breach of Texas Insurance Code § 542 is not viable as a Matter of Law**.............................................................**24**

**V. CONCLUSION**...........................................................................................................**24**

HOUIMAN\474893-1

## <u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>

*Aldous v. Darwin v. Nat'l Assurance Co.*, 889 F.3d 798 (5th Cir. 2018)…………...…………... 22

*Am. Home Assurance Co. v. Cat Tech L.L.C.*, 660 F.3d 216 (5th Cir. 2011) …………. 10, 11, 13

*Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558 (5th Cir. 2010) …10, 11

*Bayle v. Allstate Ins. Co.*, 615 F.3d 350 (5th Cir. 2010) …………………………………….. 11

*Carrigan v. State Farm Mut. Auto. Ins. Co.*, 140 Or. App. 359, 914 P.2d 1088, (1996) ..…….. 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ……………………………………….……... 10

*Certain Underwriters at Lloyd's of London v. Lowen Valley View, LLC*, Civ. Action No.
   3:16-CV-0465-B, 2017 WL 3115142 (N.D. Tex. July 21, 2017)………………………………
   ………………………………………………………..………............... 11, 23, 24

*Certain Underwriters at Lloyd's of London v. Lowen Valley View, LLC*, 892 F.3d 167 (5th Cir.
June 6, 2018) …………………………………………………………………11, 23, 24

*Chavez v. State Farm Lloyds*, 746 Fed.Appx. 337 (5th Cir. 2018) …………………………….. 23

*Church on the Rock North v. Church Mut. Ins., Co.*, No. CIV. A. 3:10–CV–0975–L,
   2013 WL 497879 (N.D.Tex. Feb.11, 2013) ……………………………..………………… 24

*Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405 (5th Cir. 1995) ………………..……... 13

*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995) ……………………... 20

*E. Tex. Fire Ins. Co. v. Kempner*, 87 Tex. 229, 27 S.W. 122 (1894) ……………………..……. 13

*Edwards v. Employees Retirement Sys.*, No. 03–03–00737–CV, 2004 WL 1898253
   (Tex. App.—Austin Aug. 26, 2004, no writ) …………………………………………….... 16

*EMS USA, Inc. v. Travelers Lloyds Ins. Co.*, CV H-16-1443, 2018 WL 1545700
   (S.D. Tex. Feb. 28, 2018) ……………………………………………………………..…… 12

*Fiess v. State Farm Lloyds*, 202 S.W.3d 744 (Tex. 2006) …………………………………….. 13

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010) …….
   ………………………………………………………………………... 12, 13, 16

*Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192 (5th Cir. 1998) ……………………………. 12

*GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822
(Tex. App.—Fort Worth 2008, no pet.) …………………………………………………… 24

*Hart v. Hairston*, 343 F.3d 762 (5th Cir. 2003) …………………………………………….. 10

*Likens v. Hartford Life & Acc. Ins. Co.*, 688 F.3d 197 (5th Cir. 2012) ………………….…... 16

*Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435 (5th Cir. 2018)………………… 22

*Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597 (Tex. 1993)…………………………... 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 575 (1986) ……………….…... 10

*Moore v. Allstate Texas Lloyd's*, 742 Fed. Appx. 815 (5th Cir. 2018)……………….…………. 22

*Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452 (5th Cir. 2009) ……….. 13, 14

*Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642 (5th Cir. 2008) …………………… 14

*Progressive Cty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919 (Tex.2005)…………………………... 23

*Republic Ins. Co. v. Stoker*, 903 S.W.2d 338 (Tex. 1995) ……………………………………... 23

*S. Pac. Co. v. Ralston*, 67 F.2d 958 (10th Cir. 1933) …………………………………........… 16

*Sekel v. Aetna Life Ins. Co.*, 704 F.2d 1335 (5th Cir. 1983) …………...…………………16, 17

*State Farm Lloyds v. Marchetti*, 962 S.W.2d 58 (Tex.App.—Houston [1st Dist],
writ denied ……………………………………………………………………………...… 16

*SWE Homes, LP v. Wellington Ins. Co.*, 436 S.W.3d 86 (Tex. App.–Houston  [14th Dist.]
2014, no pet.) …………………………………………………………………………………11

*Union Ins. Co. v. Smith*, 124 U.S. 405, 8 S. Ct. 534, 31 L. Ed. 497 (1888) …………….....… 16

*USAA Tex. Loyds Co. v. Menchaca*, 545 S.W.3d 479 (Tex. 2018)……...…………..21, 22, 23, 24

*Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512
(5th Cir. 2015) ………………………………………………………………...…... 24

*White v. Dietrich Metal Framing*, No. CIV.A. 1:06-CV-554, 2007 WL 7050943
(E.D. Tex. Nov. 29, 2007) …………………………………………………….......... 10

v

## Rules and Statutes:

Federal Rule of Civil Procedure 56 ……………………………………………...…... 1, 10

Federal Rule of Civil Procedure 56(c) ……………………………………………… 10

Federal Rule of Civil Procedure 56(e) …………………………………………….... 10

Texas Insurance Code § 541 …………………………………………… 2, 21, 22, 23

Texas Insurance Code § 542 …………………………………….……… 2, 22, 24

## Other Authorities:

*Merriam-Webster's Collegiate Dictionary* 268 (11th ed. 2007) ……………………………… 16

**DEFENDANT'S BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Federal Rule of Civil Procedure 56, Certain Underwriters at Lloyd's of London, Subscribing to Policy Number EE1701590 ("Underwriters" or "Defendant"), file this Brief in Support of its Motion for Summary Judgment in respect of the claims for coverage filed by Dillon Gage Incorporated of Dallas ("Plaintiff" or "Dillon Gage"), and would respectfully show the Court as follows:[1]

## I.
## SUMMARY OF THE ARGUMENT

Underwriters are entitled to summary judgment on the causes of action against them:

1. **The *Invalid Payments Exclusion Clause* applies to exclude coverage for Dillon Gage's losses by its plain meaning. Dillon Gage sustained two losses consequent upon handing over the Insured property against payment by a fraudulent check.** For both losses at issue, Dillon Gage created the Sales Invoices and packaged, released and shipped the Insured property to Kenneth Bramlett's home address only after it first established that the checks had cleared Kenneth and Laurie Bramlett's respective bank accounts. The Sales Invoices (emailed to the alleged Kenneth Bramlett at the time of shipment) included the tracking numbers for the packages, which allowed the criminal to redirect the delivery of the packages. The Sales Invoices would never have been generated in expectation of shipping had the checks not cleared first. The events involved in the fraudulent scheme, concluding with the physical theft of the packages, were all consequent upon payment by the fraudulent checks. Each event, including redirection of the packages, would not have occurred without the payment first being made by fraudulent check. The Policy Exclusion does not require a knowledge element. So regardless of whether Dillon Gage knew that the checks were fraudulent, Dillon Gage ultimately sustained both losses following as an effect or result of payment by the fraudulent checks.

2. **The Plain Language of the *Invalid Payments Exclusion Clause* excludes coverage for Dillon Gage's Losses, and to read the Policy Exclusion otherwise would fail to give effect to each Policy provision, and thus render the Exclusion meaningless.** The Policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense. A plain reading of the Exclusion reveals its application to Dillon Gage's losses arising from payment for the

---

[1] Underwriters rely on summary judgment evidence attached hereto and incorporated by reference in full where indicated. Please find attached the Affidavit of Gerard J. Kimmitt, II, marked as **Exhibit A, App. 3-7.**

Insured property against the fraudulent checks. A loss that occurs against a fraudulent payment would always result in a physical taking (theft). Both of Dillon Gage's losses fall squarely within the intent of the Exclusion and any other application would render the Exclusion meaningless and make it illusory.

3.  **Because Plaintiff's breach of contract cause of action fails, and because there is no injury independent of the right to policy benefits, Plaintiff's extra-contractual claims filed pursuant to §541 and §542 also fail as a matter of law.** Plaintiff alleges wrongful refusal to pay the claims under the Policy. Underwriters contend that the *Invalid Payments Exclusion Clause* applies to exclude coverage for Dillon Gage's losses. Because Plaintiff's breach of contract claim fails, Plaintiff's extra-contractual claims also fail as a matter of law because Plaintiff has no right to policy benefits, and there is no injury independent of the right to policy benefits. Plaintiff has not provided any evidence otherwise. Accordingly, Underwriters are entitled to summary judgment on Plaintiff's extra-contractual claims.

## II.
### FACTUAL BACKGROUND

1.      **Dillon Gage's Claims against Underwriters for the two Losses.**

This is a civil action filed by Plaintiff Dillon Gage against Underwriters seeking coverage for two claims made under Policy EE1701590.[2] Dillon Gage alleges that Underwriters wrongfully refused to pay two different claims related to (1) three packages of precious metal coins stolen on February 13, 2018 (totaling $549,000.00); and (2) five packages of precious metal coins stolen on February 22, 2018 (totaling $655,000.00) (the "Losses").[3] Dillon Gage's Amended Complaint alleges the following causes of action against Underwriters:

- **Count 1**: Breach of Contract;
- **Count 2**: Texas Insurance Code Violations;
- **Count 3**: Prompt Payment Violation; and
- **Count 4**: Attorneys' Fees.[4]

Dillon Gage is a wholesaler of bullion coins and precious metal products.[5] Underwriters

---

[2]     Please find attached a copy of Plaintiff's First Amended Complaint against Defendant (Doc. No. 21), marked as **Exhibit B**; **App. 8-16**. Please also find attached a copy of Defendant's First Amended Answer (Doc. No. 24), marked as **Exhibit C, App. 17-26**.

[3]     *See* **Exhibit B, App. 8-16.**

[4]     *See* **Exhibit B, App. 8-16.**

[5]     *See Id.*

2

issued the "Insurance of: Coin Dealers USA", Policy Number EE1701590000, to the Insured –

"Dillon Gage Incorporated of Dallas and Diamond State Depository, LLC and International

Depository Services of Canada, Inc. as their respective rights and interests may appear"

("Plaintiff", "Dillon Gage" or the "Insured") (the "Policy").[6] The All Risk Policy provides

shipping coverage to Dillon Gage for "Interest"[7], for the period from May 12, 2017 to May 12,

2018, subject to certain Exclusions in the Policy, including the *Invalid Payments Exclusion*

*Clause*, at issue here.

### 2.    Agreed Stipulations of Fact Between the Parties

Dillon Gage and Underwriters agree to stipulate to the following facts as part of the

record for purposes of this motion for summary judgment[8]:

1.  On January 28, 2018, Dillon Gage received a new customer online application submission with the name listed as Kenneth Bramlett. This online application also included a copy of an Alabama Driver's License of the alleged Kenneth Bramlett and other identifying information. Among the information provided was the home address of 2933 Canterbury Road, Mountain Brook, Alabama, 35223. (Dillon Gage 000335 – 000336)[9].

2.  On January 29, 2018, the first order (of two orders made) was placed with Dillon Gage by the alleged Kenneth Bramlett for $549,000.00 worth of gold coins.

3.  On January 29, 2018, Dillon Gage received a PNC Bank check #121 (dated January 29, 2018), Account #50048121097025, in the amount of $549,000.00, from the joint account of Kenneth and Laurie Bramlett, signed by Laurie Bramlett (Dillon Gage 000317-000318)[10].

---

[6]     Please find attached a copy of Policy with the Unique Market Reference: B0901EE1701590000, marked as **Exhibit D, App. 27-69** (The Policy is herein referenced as Policy No. EE1701590).

[7]     *See* **Exhibit D; App. 27-69** ("Interest" means "Stock of: Coins, numismatics, paper money and material of like kind and nature including but not limited to rare coins, bullion coins and the items of a numismatic interest, precious or semi-precious metals, metal bearing solvents, refinery scrap and 'in-process' metals and dust, items of a jewellery nature and the Insured's supplies and reference material, all being the property of the insured or for which they are responsible or instructed to Insure.")

[8]     Please find attached a copy of FRCP 56(c)(1)(A) Stipulations (Doc. No. 35), marked as **Exhibit E, App. 70-74.**

[9]     Please find attached a copy of Dillon Gage 000335-000336, marked as **Exhibit F, App. 75-78.**

[10]    Please find attached a copy of Dillon Gage 000317-000318, marked as **Exhibit G, App. 79-81.**

3

4. On January 30, 2018, Dillon Gage deposited check #121 with its bank, BBVA Compass, and was given provisional credit by BBVA Compass. (CB000001-2)[11].

5. On February 12, 2018, Dillon Gage received notice that Check #121 cleared Kenneth and Laurie Bramlett's account. Dillon Gage then created a Sales Invoice (Dillon Gage 000297)[12], packaged, released, and shipped three (3) packages to Kenneth Bramlett at his home address via UPS. (Dillon Gage 000302-000308)[13]. Dillon Gage assigned each package a tracking number via UPS, listed on the Sales Invoice. The three (3) packages were picked up at Dillon Gage's office in Addison, Texas by UPS, and scanned into the UPS high value stream system between 7:30-7:31 pm as the "origin scan." (Dillon Gage 000400[14]; Dillon Gage 000338-000340[15]). On February 12, 2018, Dillon Gage provided the three (3) tracking numbers to the alleged Kenneth Bramlett via email. (Dillon Gage 000358)[16].

6. On February 12, 2018, and only minutes after the origin scan, at 7:43-7:44 pm, the UPS tracking history notes that "A UPS My Choice delivery change was requested for this package. / The receiver arranged to pick up the packages at a UPS facility." (Dillon Gage 000400[17]; Dillon Gage 000338-000340[18]).

7. On February 13, 2018, three (3) packages were delivered to a UPS facility in Birmingham, Alabama at 8:25 am. Three (3) minutes later, at 8:28 am, an individual collected the packages from the UPS facility. (Dillon Gage 000400[19]; Dillon Gage 000338-000340[20]) (UPS 47-53)[21].

8. The individual who collected the three (3) packages from the UPS facility in Birmingham was not Kenneth Bramlett or Laurie Bramlett.

9. On February 13, 2018, Dillon Gage received the second order placed by the alleged Kenneth Bramlett. (Dillon Gage 000374)[22].

10. On February 14, 2018, Dillon Gage received a PNC Bank check # 647 (dated February 13, 2018), Account #3121404582, from the joint account of Kenneth and Laurie Bramlett, in the amount of $655,000.00 and locked trade. (Dillon Gage 000313-000314)[23].

---

[11]    Please find attached a copy of CB000001-2, marked as **Exhibit H, App. 82-92**.
[12]    Please find attached a copy of Dillon Gage 000297, marked as **Exhibit I, App. 93-94**.
[13]    Please find attached a copy of Dillon Gage 000302-000308, marked as Exhibit J, **App. 95-102.**
[14]    Please find attached a copy of Dillon Gage 000400, marked as **Exhibit K, App. 103-104.**
[15]    Please find attached a copy of Dillon Gage 000338-000340, marked as **Exhibit L, App. 105-108.**
[16]    Please find attached a copy of Dillon Gage 000358, marked as **Exhibit M, App. 109-110.**
[17]    *See* **Exhibit K, App. 103-104.**
[18]    *See* **Exhibit L, App. 105-108.**
[19]    *See* **Exhibit K, App. 103-104.**
[20]    *See* **Exhibit L, App. 105-108.**
[21]    Please find attached a copy of UPS 47-53, marked as **Exhibit N, App. 111-126.**
[22]    Please find attached a copy of Dillon Gage 000374, marked as **Exhibit O, App. 127-128.**
[23]    Please find attached a copy of Dillon Gage 000313-314, marked as **Exhibit P, App. 129-131.**

11. On February 14, 2018, Dillon Gage deposited check #647 with its bank, BBVA Compass, and was given provisional credit by BBVA Compass. (CB000015-16)[24] (CB000152-153)[25].

12. On February 22, 2018, Dillon Gage received notice that Check #647 cleared Kenneth and Laurie Bramlett's account. Dillon Gage then created a Sales Invoice (Dillon Gage 000298)[26], packaged, released, and shipped five (5) packages to Kenneth Bramlett at his home address via UPS. (Dillon Gage 000302-000308)[27]. Dillon Gage assigned each package a tracking number via UPS, listed on the Sales Invoice. The five (5) packages were picked up at Dillon Gage's office in Addison, Texas by UPS, and scanned into the UPS high value stream system at 7:40 pm as the "origin scan." (Dillon Gage 000417[28]; Dillon Gage 000320-000333[29]). On February 22, 2018, Dillon Gage provided the five (5) tracking numbers to the alleged Kenneth Bramlett via email.

13. On February 22, 2018, after the origin scan, at 8:50-8:54 pm, the UPS tracking history notes that "A UPS My Choice delivery change was requested for this package. / The receiver will pick up the packages at the UPS facility." (Dillon Gage 000417[30]; Dillon Gage 000320-000333[31]).

14. On February 23, 2018, five (5) packages were delivered to a UPS facility in Birmingham, Alabama at 8:50 am. Following, an individual signed for and collected the five (5) packages from the UPS facility. (Dillon Gage 000320-000333)[32] (UPS 47-53)[33].

15. The individual who collected the five (5) packages from the UPS facility in Birmingham was not Kenneth Bramlett or Laurie Bramlett. This is evidenced by CCTV video footage of the UPS facility in Birmingham, Alabama on February 23, 2018. The CCTV video footage is a fair and accurate depiction of the UPS facility in Birmingham, Alabama as it looked the morning of February 23, 2018.

16. On February 26, 2018, Laurie Bramlett signed an affidavit of fraud related to Check #647 and provided it to PNC Bank. (Dillon Gage 000310)[34].

17. On March 1, 2018, Compass received a large dollar notification from its vendor indicating that Check #647 was unauthorized (forged counterfeit) and that PNC Bank

---

[24]    Please find attached a copy of CB000015-16, marked as **Exhibit Q, App. 132-134.**
[25]    Please find attached a copy of CB000152-153, marked as **Exhibit R, App. 135-137.**
[26]    Please find attached a copy of Dillon Gage 000298, marked as **Exhibit S, App. 138-139.**
[27]    *See* **Exhibit J, App. 95-102.**
[28]    Please find attached a copy of Dillon Gage 000417, marked as **Exhibit T, App. 140-141.**
[29]    Please find attached a copy of Dillon Gage 000320-000333, marked as **Exhibit U, App. 142-156.**
[30]    *See* **Exhibit T, App. 140-141.**
[31]    *See* **Exhibit U, App. 142-156.**
[32]    *See Id.*
[33]    See **Exhibit N, App. 111-126.**
[34]    Please find attached Dillon Gage 000310, marked as **Exhibit V, App. 157-158.**

would be sending it back; and that PNC Bank would receive a credit to its account and there would be a corresponding debit to BBVA Compass, which occurred. (CB000152-153[35]; CB000024-27[36]).

18. On March 8, 2018, BBVA Compass received a large dollar notification from its vendor indicating that Check #121 was unauthorized (forged counterfeit), and that an additional item issued by the same customer to Dillon Gage would be returned to Compass for the same reasons. (CB000152-153[37]; CB000004-7[38]).

19. On March 14, 2018, Laurie Bramlett signed an affidavit of fraud related to Check #121, and provided it to PNC Bank. (Dillon Gage 000309)[39].

**3.      The Policy**

Policy No. EE1701590 provides shipping coverage to Dillon Gage pursuant to the

following Policy terms:

**RISK DETAILS**
**INTEREST: Stocks of:**
Coins, numismatics, paper money and material of like kind and nature including but not limited to rare coins, bullion coins and the items of a numismatic interest, previous or semi-precious metals, metal bearing solvents, refinery scrap and 'in-process' metals and dust, items of a jewelry nature and the Insured's supplies and reference material, all being the property of the insured or for which they are responsible or instructed to insure.
                                                *****
**SECTION D – Shipping Coverage**
Whilst being shipped via postal or courier transit by means detailed below including with Custom House Brokers within the normal course of transit. Limits stated are 'any one package' and include conveyances to and from insured shipping services.
…
D4      UPS                                  USD 200,000
        UPS Adult Signature Service          USD 200,000
                                        *****
**DEDUCTIBLE**
Increasing for UPS Only:  USD 10,000 each and every loss

---

[35]     *See* **Exhibit R, App. 135-137.**
[36]     Please find attached CB000024-27, marked as **Exhibit W, App. 159-163.**
[37]     *See* **Exhibit R, App. 135-137.**
[38]     Please find attached CB000004-7, marked as **Exhibit X, App. 164-168.**
[39]     Please find attached Dillon Gage 000309, marked as **Exhibit Y, App. 169-170.**

HOUIMAN\474893-1

The application of the deductible will apply to any one loss or series of losses arising out of the same event. Only one deductible applies upon discovery of a loss.

*****

## ALL RISKS OF PHYSICAL LOSS OR DAMAGE

This Section insures against physical loss of or physical damage to the Insured Property as defined below and stated in the Risk Details, 'Sum Insured' while at the named location(s) and elsewhere within the territorial limits as specified in the Risk Details, 'Situation' occurring during the period of insurance, subject to the following Exclusions, Basis of Valuation and Conditions. …

*****

## SECTION A – CONDITIONS TAILORED FOR YOU
**Valuation Clause**
Goods Sold but not delivered
Invoice Value

*****

## SECTION B – Contract Extensions
**Financial Crime – Invalid Payments Extension Clause**
Notwithstanding the Invalid Payment Exclusion Clause contained herein, it is understood and agreed that coverage hereunder is extended to cover physical loss of insured interest as a direct result of any fraudulent or dishonest payment(s). Underwriters liability hereunder is limited to USD $12,500 each and every loss and in the aggregate during the policy period and subject to a deductible of USD 1,000 each and every loss or series of losses.

*****

## SECTION C – Transits and Shipping – Conditions and Exclusions
**Postal Clause**
It is a condition precedent to Underwriters liability hereunder in respect of sending losses that when using any of the shipping methods insured as described under Section D, the Insured is obliged to utilize a service which provides for signatures to be obtained on delivery.

*****

## SECTION D – Standard General Exclusions
**Invalid Payments Exclusion Clause**
Notwithstanding anything contained herein to the contrary, this contract excludes any claim in respect of the property insured hereunder, where the loss has been sustained by the Insured consequent upon handling over such Insured property to any third party against payment by:

- Cheque, Banker's Draft, or any other form of Money Order, where such Cheque…shall prove to be false, fraudulent or otherwise invalid or uncollectible for any reason whatsoever.

*****

7

Section D – *Standard General Exclusions, Invalid Payments Exclusion Clause* applies to exclude coverage to Dillon Gage for both Losses at issue in this litigation. Underwriters also contend, though not Underwriters' burden, that coverage under the Policy is extended to Dillon Gage for both Losses pursuant to the Extension Clause in Section B – *Contract Extensions, Financial Crime – Invalid Payments Extension Clause.* Dillon Gage however asserted that neither the Exclusion nor the Extension apply, refused coverage based on the terms of the extension, and filed this lawsuit.

    **4.**    **Underwriters Agreed to Pay the Claims Pursuant to the *Financial Crime – Invalid Payments Extension*.**

On April 16, 2018, Hedrick Kring, on behalf of its client Dillon Gage, sent correspondence to JLT Specialty Limited.[40] This letter states that neither the exclusion or extension clause apply to the Losses, and argues that Dillon Gage would not have incurred the Losses except that an unknown criminal diverted the UPS packages from delivery to Kenneth Bramlett's home, and then physically took the packages at the UPS facility, which Dillon Gage alleges to be separate and independent causes of the Losses.[41] Dillon Gage's causation analysis makes several speculative assumptions about the Losses, but fails to directly address the Exclusion and its application to the Losses.

On April 26, 2018, Underwriters responded to Dillon Gage's letter, denying coverage pursuant to the *Invalid Payments Exclusion*, but accepting coverage for the Losses under the *Financial Crime – Invalid Payments Extension.*[42] Underwriters' letter explained that the events involved in the fraud that lead to the Losses included all of the following ("Events"):

---

[40]    Please find attached a copy of correspondence from Hedrick Kring PLLC to JLT Specialty Limited, dated April 16, 2018, marked as **Exhibit Z, App. 171-173.**

[41]    *See Id.* (Underwriters strongly disputes this arguments and contends that Dillon Gage's position is based on facts that <u>did not occur</u> and are speculative at best).

[42]    Please find attached a copy of correspondence from ARK to JLT Spcialty Ltd., dated April 26, 2018, marked as **Exhibit AA, App. 174-177.**

- Filling out of an online application using Kenneth Bramlett's personal information;
- Making the fraudulent payments using Kenneth and Laurie Bramlett's checks and bank accounts;
- Redirecting the shipments for delivery to the UPS facility; and
- Physically taking (theft) of the packages from the UPS facility.

Underwriters explained that Dillon Gage's coverage position fails to give effect to each Policy provision; rendering the exclusion language meaningless, and is therefore inconsistent with Texas law. Each of the Events involved in the fraud and ultimate theft of the Insured Interest demonstrate a continuing course of conduct in furtherance of a fraudulent scheme, and no Event occurred singularly in a vacuum. Each of the Events listed above, including the fraudulent payments made the basis of the Exclusion, contributed to the ultimate Losses, as part of that scheme. However, focusing on the Exclusion, **Dillon Gage would not have shipped the Insured Interest had it not first confirmed that the checks had cleared. So despite what Events occurred next, shipping the Insured Interest against payment by what was established to be fraudulent checks resulted in the Losses**.[43]

### 5.    Procedural History

On May 17, 2018, Dillon Gage filed its Original Petition in the Dallas County, Texas State District Court.[44] Underwriters filed their Original Answer in the State Court proceeding on June 8, 2018. Then, on June 15, 2018, Underwriters filed a Notice of Removal to the United States District Court for the Northern District of Texas, Dallas Division.[45] On July 30, 2018, the parties filed a Joint Status Report, stating their agreement that the primary issue is coverage, and stating each parties' intent to file Motions for Summary Judgment further to each parties' coverage position following brief discovery.[46] On October 25, 2018, Dillon Gage sought leave to

---

[43]    *See Id.*
[44]    **Exhibit B, App. 8-16**.
[45]    *See* Defendant Notice of Removal (Doc. No. 1).
[46]    *See* Joint Status Report (Doc. No. 11).

file an Amended Complaint to add Defendant UPS Capital Insurance Agency, Inc, which the Court granted the following day.[47] Dillon Gage filed its First Amended Complaint on October 26, 2018.[48] Defendant Underwriters filed their First Amended Answer on November 5, 2018.[49] On March 27, 2019, the parties filed a Stipulations of Partial Voluntary Dismissal, dismissing Defendant UPS Capital Insurance Agency, Inc. from the lawsuit.[50]

## III.
### SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting a previous edition of FED. R. CIV. P. 56(c)); *see Hart v. Hairston* 343 F.3d 762, 764 (5th Cir. 2003); *See also* FED. R. CIV. P. 56(c)(including citation to stipulations). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 575, 585-87 (1986). However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586-87 (quoting FED. R. CIV. P. 56(e)). *See Matsushita,* 475 U.S. at 587; *White v. Dietrich Metal Framing*, No. CIV.A. 1:06-CV-554, 2007 WL 7050943, at *2 (E.D. Tex. Nov. 29, 2007) (citing *Celotex Corp.*, 477 U.S. at 322 n. 3) (quoting FED. R. CIV. P. 56(e)). The "interpretation of an insurance policy is a question of law for a court to determine." *Am. Home Assurance Co. v. Cat Tech L.L.C.*, 660 F.3d 216, 220 (5th Cir. 2011) (quoting *Am.*

---

[47]     *See* Doc. Nos. 19-21.
[48]     *See* **Exhibit B, App. 8-16.**
[49]     *See* **Exhibit C, App. 17-26.**
[50]     *See* Stipulation of Partial Voluntary Dismissal (Doc. No. 34).

*Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010)).

## IV.
### ARGUMENT AND AUTHORITIES

**A.** **Underwriters did not breach the contract because the plain language of the *Invalid Payments Exclusion Clause* excludes coverage for Dillon Gage's Losses; and to read the Policy Exclusion otherwise would fail to give effect to each Policy provision, and thus render the Exclusion meaningless.**

Texas law provides that insurance policies are construed according to common principles governing the construction of contracts...." *Certain Underwriters at Lloyd's of London v. Lowen Valley View, LLC*, Civ. Action No. 3:16-CV-0465-B, 2017 WL 3115142 at *8 (N.D. Tex. July 21, 2017) aff'd 892 F.3d 167 (5th Cir. June 6, 2018); *Am. Home Assurance Co. v. Cat Tech L.L.C.*, 660 F.3d 216, 220 (5th Cir. 2011) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010)). The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance tendered by [Plaintiff]; (3) breach of the contract by [Underwriters]; and (4) damages to [Plaintiff] resulting from that breach. *See Lowen Valley View* at *8.

### 1.      Texas law applies.

When jurisdiction is based on diversity, as it is here, it is proper to apply the forum state's substantive law. *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). Moreover, the Policy's "Choice of Law and Jurisdiction" provison states that Texas law will apply.[51]

### 2.      The burden of proof in the insurance policy context.

Under Texas law, the insured bears the initial burden of establishing that coverage is potentially provided by the applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage.*See SWE Homes, LP v. Wellington Ins. Co.,* 436 S.W.3d 86, 90 (Tex. App.–Houston [14th Dist.] 2014, no pet.). If the

---

[51]      *See* the Policy, **Exhibit D, App. 27-69**.

insurer is successful, the burden shifts back to the insured to prove that an exception to the exclusion applies. *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998); *EMS USA, Inc. v. Travelers Lloyds Ins. Co.*, CV H-16-1443, 2018 WL 1545700, at *3 (S.D. Tex. Feb. 28, 2018).

     **3.**    **Dillon Gage's Losses are excluded by the plain language of the *Invalid Payments Exclusion Clause* because the Losses were consequent upon handing over the Insured Interest to a third party against payment by fraudulent check.**

The Policy's exclusion titled *Invalid Payments Exclusion Clause* states:

**SECTION D – Standard General Exclusions**
**Invalid Payments Exclusion Clause**
Notwithstanding anything contained herein to the contrary, this contract excludes any claim in respect of the property insured hereunder, where the loss has been sustained by the Insured consequent upon handing over such Insured property to any third party against payment by:

**-**     Cheque…where such Cheque…shall prove to be false, fraudulent or otherwise invalid or uncollectible for any reason whatsoever.

A plain reading of the exclusion in light of the stipulated facts supports its application to Dillon Gage's Losses. The plain terms exclude coverage where the Losses resulted from Dillon Gage's shipping the Insured Interest (precious metal coins) against payment by a fraudulent check. This is precisely what occurred here.

     **a.**  **The Policy must be governed by its plain language; and all parts of the contract must be read together to ascertain the agreement of the parties so none are rendered meaningless.**

Under Texas law, "[i]nsurance policy interpretation principles emphasize a policy's plain language in determining its intended coverage." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 131 (Tex. 2010). Courts first "look at the language of the policy because we presume parties intend what the words of their contract say." *Id.* at 126. "The parties' intent is governed by what they said in the insurance contract, not by what one side or

12

the other alleges they intended to say but did not." *Id.* at 127; *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006). "The policy's terms are given their <u>ordinary and generally-accepted meaning</u> unless the policy shows the words were meant in a technical or different sense." *Gilbert*, 327 S.W.3d at 126 (emphasis added). "We examine the entire agreement and seek to harmonize and <u>give effect to all provisions so that none will be meaningless.</u>" *Id.* (emphasis added). "For more than a century" the Supreme Court of Texas "has held that in construing insurance policies 'where the language is <u>plain and unambiguous,</u> courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.' " *Fiess*, 202 S.W.3d at 753 (quoting *E. Tex. Fire Ins. Co. v. Kempner*, 87 Tex. 229, 27 S.W. 122, 122 (1894)) (emphasis added).

An insurance policy is only ambiguous if its plain language is amenable to more than one reasonable interpretation." *Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009). "But an ambiguity does not exist simply because the parties interpret a policy differently." *Gilbert*, 327 S.W.3d at 133. "If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law." *Id.* "When an exclusion is clear and unambiguous," courts "interpret it according to its plain meaning, and give no deference to the insured's interpretation." *Cat Tech L.L.C.*, 660 F.3d at 220. "Where the language of a contract is clear, a court's inquiry should begin and end with the policy's language." *Nautilus*, 566 F.3d at 455.

"Texas law does not recognize coverage because of 'reasonable expectation' of the insured." *Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405, 410 n.4 (5th Cir. 1995); *see also Nautilus*, 566 F.3d at 455, 458 n.4 ("Texas law does not look to the 'reasonable

expectations' of the insured."); *Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 648 (5th Cir. 2008) (stating that "under Texas law, the reasonable expectations of the insured are not to be considered when the policy language is unambiguous").

Here, the Policy Exclusion is not ambiguous. The purpose and intent of the insurance contract was to furnish protection against all losses of "Interest", excepting losses resulting from fraudulent payments. The insurance policy unambiguously states no coverage from a "loss…consequent upon…payment by [a false check]." Certainly, a criminal who makes payment with a false or fraudulent check intends to, and likely will, gain physical possession of some item. Following this logic, it would be irrational to contend that the Insured's shipment of Interest against a fraudulent check would not be covered, but that the subsequent physical loss (theft) of the same Insured Interest (that was paid for with the fraudulent check) would be covered. Dillon Gage's coverage argument is not logical based on the plain meaning of the Policy. The parties did not intend for the Insured Interest, after being shipped against a fraudulent payment, to be covered by the Policy at any stage. To find otherwise, would render the Exclusion meaningless and illusory.

> **b. Dillon Gage sustained the Losses consequent upon handing over the insured property to a third party against payment by check proven to be false, fraudulent, or otherwise invalid or uncollectible.**

The issue is: *Did Dillon Gage sustain the Losses consequent upon handing over the property against payment by a fraudulent check?* If so, then both Losses are excluded under the Policy.

> **i. There is no dispute that both checks paid to Dillon Gage for the insured property were false, fraudulent, invalid, and uncollectible**.

As a preliminary matter, there is no dispute that the two checks paid to Dillon Gage by the alleged Kenneth Bramlett were "false, fraudulent, or otherwise invalid or uncollectible", as

stated in the exclusion.

On January 29, 2018, Dillon Gage received a PNC Bank check #121 (dated January 29, 2018), Account #50048121097025, in the amount of $549,000.00, from the joint account of Kenneth and Laurie Bramlett, signed by Laurie Bramlett (Dillon Gage 000317-000318)[52]. Then, on February 14, 2018, Dillon Gage received a second PNC Bank check # 647 (dated February 13, 2018), Account #3121404582, from the joint account of Kenneth and Laurie Bramlett, in the amount of $655,000.00 and locked trade. (Dillon Gage 000313-000314)[53].

On February 26, 2018, Laurie Bramlett signed an affidavit of fraud related to Check #647 and provided it to PNC Bank. (Dillon Gage 000310)[54]. And on March 14, 2018, Laurie Bramlett signed an affidavit of fraud related to Check #121, and provided it to PNC Bank. (Dillon Gage 000309)[55].

Also, on March 1, 2018, Compass received a large dollar notification from its vendor indicating that Check #647 was unauthorized (forged counterfeit) and that PNC Bank would be sending it back; and that PNC Bank would receive a credit to its account and there would be a corresponding debit to BBVA Compass, which occurred (CB000152-153[56]; CB000024-27[57]). Then, similarly, on March 8, 2018, BBVA Compass received a large dollar notification from its vendor indicating that Check #121 was unauthorized (forged counterfeit), and that an additional item issued by the same customer to Dillon Gage would be returned to Compass for the same reasons. (CB000152-153[58]; CB000004-7[59]).

---

[52]     *See* **Exhibit E, App. 70-74**; *see also* **Exhibit G, App. 79-81.**
[53]     *See* **Exhibit E, App. 70-74**; *see also* **Exhibit P, App. 129-131.**
[54]     *See* **Exhibit E, App. 70-74**; *see also* **Exhibit V, App. 157-158;** *see also* Deposition Transcript of Laurie Bramlett, p. 32:19 – 36:8, marked as **Exhibit BB, App. 178-185.**
[55]     *See* **Exhibit E, App. 70-74**; *see also* **Exhibit Y, App. 169-170;** *see also* Deposition Transcript of Laurie Bramlett, p. 32:19 – 36:8, marked as **Exhibit BB, App. 178-185.**
[56]     *See* **Exhibit E, App. 70-74, Exhibit R, App. 135-137.**
[57]     *See* **Exhibit E, App. 70-74, Exhibit W, App. 159-163.**
[58]     *See* **Exhibit E, App. 70-74** and **Exhibit R, App. 135-137.**

There is <u>no</u> dispute that the checks at issue that were written to Dillon Gage were false, fraudulent, invalid, and uncollectible.

### ii. Dillon Gage sustained the Losses consequent upon handing over insured property against payment by fraudulent check.

The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows that words were meant in a technical or different sense. *Gilbert*, 327 S.W.3d at 126. Here, there is no reason to believe, or case law supporting, that the term "consequent upon" as used in the exclusion was meant in a technical or different sense.[60] An ordinary and generally-accepted meaning of "consequent" means following as an effect or result. *Merriam-Webster's Collegiate Dictionary* 268 (11th ed. 2007). Moreover, the U.S. Supreme Court held that the language "consequent upon" should include results "occasioned by" the initiating factor. *Union Ins. Co. v. Smith*, 124 U.S. 405, 428, 8 S. Ct. 534, 546, 31 L. Ed. 497 (1888).

In another, more recent case, *Sekel v. Aetna Life Ins. Co.*, the Fifth Circuit analyzed similar policy language to determine how an exclusion clause applied. 704 F.2d 1335 (5th Cir. 1983). The exclusion clause in the policy denied coverage for accidental death benefits respecting "any loss resulting from any injury caused or contributed to by, or **as a consequence of**, any of the ... excluded risks, even though the proximate or precipitating cause of loss is accidental bodily injury." The Court stated,

---

[59]     *See* **Exhibit E, App. 70-74** and **Exhibit X, App. 164-168.**

[60]     There is no Texas case (and very few cases) that directly interpret or define the phrase "consequent upon" as utilized in a similar insurance coverage context. However, "consequent upon" does not equate to proximate cause. The term "as a direct result of" in Texas has retained the same definition as proximate cause. *Likens v. Hartford Life & Acc. Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012) citing *Edwards v. Employees Retirement Sys.*, No. 03–03–00737–CV, 2004 WL 1898253, at *5 (Tex.App.—Austin Aug. 26, 2004, no writ) (interpreting an exclusion where injury was the "direct result" of the insured's intoxication as requiring alcohol be the proximate rather than sole cause). The term "resulting in" requires some degree of causation. *S. Pac. Co. v. Ralston*, 67 F.2d 958, 969 (10th Cir. 1933). The terms "resulting from" or "caused by" have not been determined to be a "but for" standard, or to mean proximate cause, rather a judgment call must be made as to where along the continuum of causation falls the facts of each case. *See Carrigan v. State Farm Mut. Auto. Ins. Co.*, 140 Or.App. 359, 363-66, 914 P.2d 1088, 1089-91 (1996); *see also State Farm Lloyds v. Marchetti*, 962 S.W.2d 58, 61 (Tex.App.—Houston [1st Dist], writ denied).

16

this language contemplates a situation where "*the* proximate or precipitating cause of loss" is accidental bodily injury, and makes clear that, "*even though*" the accidental injury is *the* proximate or precipitating cause, if disease or bodily infirmity is also a contributing factor or cause, there is no coverage. Since the exclusion clause by its terms is applicable when *the* proximate or precipitating cause of loss is an accidental injury, necessarily implicit in its meaning is that other contributing factors or causes which the policy excludes (*e.g.,* "bodily or mental infirmity" or "disease") *need not be concurrent proximate or as immediately precipitating causes* for the exclusion to have effect. Thus, a loss, a **functionally closely related significant cause or contributing factor of which is a noncovered risk**, is excluded from the policy's accidental death benefits even though a covered risk is the proximate and more immediately precipitating cause of the loss.

*Sekel* at 1338-39 (5th Cir. 1983) (emphasis added). The Fifth Circuit concluded that the terms "caused or contributed to by, or as a consequence of" means a "functionally closely related significant cause or contributing factor."

Here, the term "consequent upon" is not ambiguous and must be used in its ordinary and generally-accepted meaning. <u>Proximate cause is not the proper standard</u>. Although other Events occurred during the course of both Losses, and before the actual physical theft from the UPS facility, the Losses followed as an effect and resulted from the fraudulent payment to Dillon Gage, <u>without which payment Dillon Gage would never have shipped the precious metal coins</u>. Therefore, the fraudulent payment was a "closely related significant cause or contributing factor". Or, as pursuant to the U.S. Supreme Court, the Losses were "occasioned by" the fraudulent payment, which was the initiating factor.

On February 12, 2018, Dillon Gage received notice that Check #121 cleared Kenneth and Laurie Bramlett's account. Only then did Dillon Gage create a Sales Invoice (Dillon Gage 000297)[61], package, release and ship three (3) packages to Kenneth Bramlett at his home address via UPS. (Dillon Gage 000302-000308)[62]. Dillon Gage assigned each package a tracking number

---

[61]     *See* **Exhibit E, App. 70-74** and **Exhibit I, App. 93-94.**
[62]     *See* **Exhibit E, App. 70-74** and **Exhibit J, App. 95-102.**

via UPS, listed on the Sales Invoice. The three (3) packages were picked up at Dillon Gage's office in Addison, Texas by UPS, and scanned into the UPS high value stream system between 7:30-7:31 pm as the "origin scan." (Dillon Gage 000400[63]; Dillon Gage 000338-000340[64]). On February 12, 2018, Dillon Gage provided the three (3) tracking numbers to the alleged Kenneth Bramlett via email. (Dillon Gage 000358)[65].

Then, on February 22, 2018, Dillon Gage received notice that Check #647 cleared Kenneth and Laurie Bramlett's account. Dillon Gage then created a Sales Invoice (Dillon Gage 000298)[66], packaged, released, and shipped five (5) packages to Kenneth Bramlett at his home address via UPS. (Dillon Gage 000302-000308)[67]. Dillon Gage assigned each package a tracking number via UPS, listed on the Sales Invoice. The five (5) packages were picked up at Dillon Gage's office in Addison, Texas by UPS, and scanned into the UPS high value stream system at 7:40 pm as the "origin scan." (Dillon Gage 000417[68]; Dillon Gage 000320-000333[69]). On February 22, 2018, Dillon Gage provided the five (5) tracking numbers to the alleged Kenneth Bramlett via email.[70]

**Dillon Gage did not ship anything until <u>after</u> it verified that the checks had cleared the Bramlett's respective bank accounts**. Therefore, Dillon Gage shipped its Interest to the alleged Kenneth Bramlett only after payment of each respective check. Dillon Gage issued the Sales Invoices on the dates of shipment, which included the individual tracking numbers for the packages being shipped. The Sale Invoices were only issued in preparation of shipment after the bank advised that the checks had cleared. The tracking numbers included in the Sales Invoices,

---

[63]    *See* **Exhibit E, App. 70-74** and **Exhibit K, App. 103-104.**
[64]    *See* **Exhibit E, App. 70-74** and **Exhibit L, App. 105-108.**
[65]    *See* **Exhibit E, App. 70-74** and **Exhibit M, App. 109-110.**
[66]    *See* **Exhibit E, App. 70-74** and **Exhibit S, App. 138-139.**
[67]    *See* **Exhibit E, App. 70-74** and **Exhibit J, App. 95-102.**
[68]    *See* **Exhibit E, App. 70-74** and **Exhibit T, App. 140-141.**
[69]    *See* **Exhibit E, App. 70-74** and **Exhibit U, App. 142-156.**
[70]    *See* **Exhibit E, App. 70-74.**

provided to the alleged Kenneth Bramlett via email on the date of shipment, allowed the criminal to redirect the packages. **Dillon Gage would never have generated the Sales Invoices; nor would Dillon Gage have provided the Sales Invoices (with the tracking numbers) to the alleged Kenneth Bramlett, had the checks not cleared the bank first. So without payment, the criminal perpetrating the fraud could not have had access to the tracking numbers for the purpose of redirecting the deliveries. Each of the Events leading up to and contributing to the Losses of the packages were consequent upon payment by the fraudulent checks.**

As an aside, whether or not Dillon Gage had knowledge that the check was fraudulent at that time does not matter for purposes of the application of the Exclusion. The Exclusion does not include a knowledge element or requirement. Neither does it matter that the packages were redirected before the physical theft at the UPS facility. The plain meaning of the Exclusion applies because Dillon Gage's Losses occurred consequent upon handing over the Insured Interest against payment by what has been resolutely determined a fraudulent check.

Neither Loss would have occurred if there had not first been payment made. Payment was the initiating factor for all later Events involved in the fraudulent scheme. Again, Dillon Gage would never have shipped the Interest without first being informed that the checks had cleared. Furthermore, the Sales Invoices, including the tracking numbers, would not have been created or provided to the alleged Kenneth Bramlett if not for payment. Unfortunately for Dillon Gage, the checks were fraudulent, and Losses occurred during shipment. Simply put, because payment was made with a fraudulent check, and Dillon Gage suffered Losses, the Exclusion applies.

If the Exclusion does not apply here, there would never be a scenario where the exclusion would apply. Any loss that follows as an effect or result of payment by a fraudulent check would

always end with a physical taking or theft. Any other interpretation here would render the Policy exclusion meaningless.

> ### c. All causation arguments made by Dillon Gage related to what may have occurred differently in the course of the fraud are purely speculative and have no basis in this coverage analysis.

Underwriters anticipate that Dillon Gage will argue that had the delivery of the packages not been redirected to the UPS facility, they would have been delivered and received by Kenneth and Laurie Bramlett, who would have returned them to Dillon Gage. These facts are speculative at best, and Dillon Gage cannot rely on hypothetical scenarios or anticipate certain outcomes for purposes of coverage under the Policy.[71] That is not what occurred here. There are many factors that <u>might</u> have occurred differently between the shipment and theft of the Interest; but Dillon Gage cannot rely on any of those <u>possible</u> factors in pursuit of coverage. According to Christopher Vecchio's testimony, who has a 21 year career with UPS, it is possible that even if the delivery location of the packages in question was not redirected, that the packages could have been picked up by the criminal because they were tracking the packages so closely.[72] Dillon Gage's causation arguments on this basis are too far-fetched. What Dillon Gage argues did not actually occur, and therefore is too speculative. *See Doe v. Boys Clubs of Greater Dallas, Inc*., 907 S.W.2d 472, 477 (Tex. 1995) (Causation cannot be established by mere conjecture, guess, or speculation.) There were two Losses that occurred after the Insured Interest was shipped against

---

[71]     Please find the Deposition Transcript of Christopher Vecchio, pp. 41-46, marked as **Exhibit CC, App. - 186-200** (Mr. Vecchio, an account manager for UPS since 2013 (and having worked in other positions for UPS for 21 years) testified that there were known issues with the redirection of packages shipped on behalf of Dillon Gage extending through September of 2018; that he, along with Dillon Gage, was working to correct. He also tesitifed that there were issues with deliveries made on behalf of Dillon Gage without signtaures. Further, Mr. Vecchio confirmed that there were scenarios that occurred where packages shipped by UPS had been delivered to a residence without signature, and then claimed by someone other than the intended consignee. Mr. Vecchio testified that a person with the tracking numbers, such as the criminal here, would know exactly where the packages were in the shipping process, and would have knowledge of the anticipated delivery date, time, and location.).

[72]     *See Id*.

payment made by the fraudulent checks. Both Losses are excluded.

> **4.      Dillon Gage's claims are covered only to the extent that the *Financial Crime – Invalid Payments Extension Clause* applies.**

The Invalid Payments Extension Clause states as follows:

> **SECTION B – Contract Extensions**
> **Financial Crime – Invalid Payments Extension Clause**
> Notwithstanding the Invalid Payment Exclusion Clause contained herein, it is understood and agreed that coverage hereunder is extended to cover physical loss of insured interest as a direct result of any fraudulent or dishonest payment(s). Underwriters liability hereunder is limited to USD $12,500 each and every loss and in the aggregate during the policy period and subject to a deductible of USD 1,000 each and every loss or series of losses.

Even though Dillon Gage legally bears the burden of showing that the Financial Crime – Invalid Payments Extension Clause would apply, Underwriters previously accepted coverage under this Extension Clause, and agreed to make payments to Dillon Gage accordingly. However, in response to Underwriters' correspondence dated April 26, 2018, Dillon Gage rejected coverage under the Extension clause and instead filed this lawsuit against Underwriters.

**B.      Plaintiff's Extra-Contractual Claims Fail as a Matter of Law.**

We turn to Plaintiff's extra-contractual claims including violations of the Texas Insurance Code §§541 and 542.[73] Because Dillon Gage cannot create a genuine issue of material fact as to an essential element of its breach of contract claim, and its claims are predicated on policy benefits, its extra-contractual claims fail. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479,489 (Tex. 2018).[74]

> **1.      Because Plaintiff's breach of contract claim fails, Plaintiff's cause of action for violation of Texas Insurance Code §541 also fails as a matter of law because Plaintiff has no right to policy benefits, and there is no injury independent of a right to policy benefits.**

---

[73]   *See* **Exhibit B, App. 8-16.**

[74]   *See Menchaca* at 489 (citing *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993)("[t]he Code does not create insurance coverage or a right to payment of benefits that does not otherwise exist under the policy.)

Damages for Texas Insurance Code violations are a creature of statute, and are "extra-contractual" in nature. *Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 452 (5th Cir. 2018); *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479,489 (Tex. 2018)[75]

In *Menchaca*, the Texas Supreme Court recently clarified the "relationship between contract claims under an insurance policy and tort claims under the Insurance Code," by laying out several rules. *Menchaca*, 545 S.W.3d at 490. "The general rule is that an insured cannot recover policy benefits for an insurer's statutory violation if the insured does not have a right to those benefits under the policy." *Id.* This rule derives from the fact that the Insurance Code only allows an insured to recover actual damages "caused by" the insurer's statutory violation. *See id.* Under Texas law, "[w]hen an insured seeks to recover damages that 'are predicated on,' 'flow from,' or 'stem from' policy benefits, the general rule applies and precludes recovery unless the policy entitles the insured to those benefits." *Menchaca*, 545 S.W.3d at 500. Additionally, under the traditional independent-injury rule an "insured cannot recover any damages based on an insurer's statutory violation if the insured had no right to receive benefits under the policy and sustained no injury independent of a right to benefits." *Id.* at 485.[76] Here, Plaintiff's claims under the Texas Insuranc Code "are predictated on [the loss] being covered under the insurance

---

[75]   (An insured's claim for breach of an insurance contract is "distinct' and 'independent' from claims that the insurer violated its extra-contractual common-law and statutory duties … A claim for breach of the policy is a 'contract cause of action,' while a common-law or statutory bad faith claim 'is a cause of action that sounds in tort.'" (citations omitted))

[76]   The Fifth Circuit recently explained that "*Menchaca* repudiated the independent-injury rule, stating instead that an insured who establishes a right to receive benefits under an insurance policy can recover those benefits as 'actual damages' under the statute if the insurer's statutory violation causes the loss of benefits." *Aldous v. Darwin v. Nat'l Assurance Co.*, 889 F.3d 798, 799 (5th Cir. 2018) (citations omitted). Put differently, "the independent-injury rule does not restrict the damages an insured can recover ..." *Lyda Swinerton Builders, Inc.*, 903 F.3d 435 at 452 (5th Cir. 2018). Rather, the independent-injury rule "limits the recovery of *other* damages that "flow" or "stem" from a mere denial of policy benefits." *Id.* The independent-injury rule "does not apply if the insured's statutory or extra-contractual claims 'are predicated on [the loss] being covered under the insurance policy' ... or if the damages 'flow' or 'stem' from the denial of the claim for policy benefits." *Moore v. Allstate Texas Lloyd's*, 742 Fed. Appx. 815, 819 (5th Cir. 2018) citing *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 484, 489 (Tex. 2018).

policy", and Plaintiff has not plead evidence of independent injury. *Id*. at 500 (citing *Progressive Cty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 920 (Tex.2005)). As such, Plaintiff's statutory claims fail under §541.

Further, Plaintiff does not assert a common law bad faith claim against Underwriters, and has not provided any evidence showing bad faith. *See Chavez v. State Farm Lloyds*, 746 Fed.Appx. 337, 342 (5th Cir. 2018) (*Menchaca* "clarified when an insured who has shown bad faith can recover damages. It does not, however, change the standard for showing bad faith."); *See Certain Underwriters at Lloyd's of London v. Lowen Valley View, LLC*, Civ. Action No. 3:16-CV-0465-B, 2017 WL 3115142 at *16 (N.D. Tex. July 21, 2017), aff'd 892 F.3d 167 (5th Cir. June 6, 2018) (Analyzing the liability of a Texas Insurance Code §541 claim in the context of a bad faith claim, noting that "[l]iability under §541 of the Texas Insurance Code is analyzed under the same standard as common-law bad faith claims" and "[e]vidence establishing only a bona fide coverage dispute does not demonstrate bad faith.") Generally "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 341 (Tex. 1995). Likewise, "an insured does not have a bad faith claim in the absence of a breach of contract by the insurer." *Id*. Here, Underwriters investigated the claim in a timely, thorough, and diligent manner, which included considerable communication by and between brokers on behalf of Dillon Gage regarding coverage, which lead to subsequent denial of the claim based on the Exclusion in the context of the Policy wording; which is now the basis for this lawsuit.[77] Accordingly, Dillon Gage cannot, as a matter of law, maintain its Texas Insurance Code §541 claim, and its "statutory claims falls with its breach of contract claim." *See Lowen Valley*, 892 F.3d 167, 172 (5th Cir. June 6, 2018) *citing*

---

[77]     *See* **Exhibit AA, App. 174-177** (Underwriters did not misrepresent the Policy's coverage to Dillon Gage, and Dillon Gage has presented no evidence of same).

*USAA Tex. Loyds Co. v. Menchaca*, 14-0721, 545 S.W.3d 479, 489, 2018 WL 1866041, at *5 (Tex. Apr. 13, 2018).

> **2.     Plaintiff's Cause of Action for Breach of Texas Insurance Code §542 is not viable as a Matter of Law.**

As noted by this Court in its *Lowen Valley* opinion, to maintain a claim for delay of payment under the Texas Insurance Code, an insured must establish that; (1) a claim exists under the insurance policy; (2) the insurer is liable for the claim; and (3) the insurer failed to comply with the Texas Insurance Code. *See Lowen Valley* at *18, *aff'd,* (5th Cir. June 6, 2018); *see also Church on the Rock North v. Church Mut. Ins., Co.,* No. CIV. A. 3:10–CV–0975–L, 2013 WL 497879, at * 11 (N.D.Tex. Feb.11, 2013); *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 518 (5th Cir. 2015)(citing *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 830-31 (Tex.App.—Fort Worth 2008, no pet.)).

Because Plaintiff's breach of contract claim fails, Plainitff cannot establish all of the elements of its Texas Insurance Code §542 cause of action. As such, Underwriters' Motion for Summary Judgment with respect to Plaintiff's Texas Insurance Code §542 claim should be granted**.**

## V.
## CONCLUSION

Dillon Gage's Losses occurred consequent upon handing over the Insured Interest against payment by a fraudulent check, and therefore, are excluded. The plain language of the Exclusion excludes coverage for Dillon Gage's Losses, and to read the Policy Exclusion otherwise would fail to give effect to each Policy provision, and thus render the Exclusion meaningless and illusory. Because Plaintiff's breach of contract cause of action fails, and because there is no injury independent of the right to Policy benefits, Plaintiff's extra-contractual claims also fail as a

matter of law. Underwriters, therefore, respectfully request that this Court grant Underwriters'
Motion for Summary Judgment in all respects and grant all other relief to which Underwriters
may be justly entitled.

RESPECTFULLY SUBMITTED,

HOLMAN FENWICK WILLAN

/s/ Gerard J. Kimmitt, II
Gerard J. Kimmitt, II
Texas Bar No.: 11427500;
Federal ID No.: 08454
Susan H. Swanson
Texas Bar No.: 24038955; Federal ID
No.:37969
5151 San Felipe, Suite 400
Houston, Texas 77056
Telephone: (713) 917-0888
Facsimile: (713) 953-9470
jerry.kimmitt@hfw.com
susan.swanson@hfw.com
**ATTORNEYS FOR DEFENDANT,
CERTAIN UNDERWRITERS AT
LLOYD'S, SUBSCRIBING TO POLICY
NO. EE1701590**

RUSSELL & WRIGHT, PLLC

/s/ Michael C. Wright
Michael C. Wright
Texas Bar No. 22049807
mwright@rwtrial.com
RUSSELL & WRIGHT, PLLC
15770 Dallas Parkway, Suite 1050
Dallas, Texas 75248
Telephone: (972) 267-8400
Facsimile: (972) 267-8401
**LOCAL COUNSEL FOR DEFENDANT,
CERTAIN UNDERWRITERS AT
LLOYD'S, SUBSCRIBING TO POLICY
NO. EE1701590**

## CERTIFICATE OF SERVICE

A true and correct copy of this document was served via the Court's EC/MCF electronic
filing services on the following counsel on this 23rd day of April 2019:

/s/ Gerard J. Kimmitt, II
Gerard J. Kimmitt, II

25